at all on behalf of the F1, Mr. Robert G. Black, on behalf of the AFB, Mr. Thomas A. Christiansen. Thank you. Mr. Black? Thank you, Your Honor. And please, the Court, Counselor. Again, my name is Bob Black. I represent the defendant's appellants here. We have raised four basic points for consideration here. And although at times there's not a clear line of demarcation, we believe they arise sequentially here. There are some of the facts and chronology that kind of duck there and move over between those four. But I'm going to deal with them point by point. Our first one is basically a pleadings issue. And that, for this we assert, the judgment entered here is not conformed to the pleadings. There's a little bit of factual background here in terms of what has transpired. On May 2, 2008, which was the original date of closing set by this residential real estate contract, the parties got together and they extended the time of performance there to August 20, 2008, in terms of the date of closing. There are some other issues there about what happened during this conversation, but we do know one thing. Conversations took place. Date was extended at that time. When the complaint here was ultimately filed, it alleged one thing and one thing only, breach of contract as of August 20, 2008, the date of the extension under that contract. It was a one-count complaint. When the trial court entered its judgment, it found anticipatory repudiation. It found anticipatory repudiation based upon conversations that it found took place that the defendants said they could not perform, would not perform, and therefore they had anticipatorily repudiated or breached the contract. Would that have been that June conversation where the contract with the DeSilvestris was introduced into the or was it some other one? I believe it was the May 2 conversation. It could have been augmented by the June 19 conversation, but what happened here is on May 2. Obviously there was a conversation that the plaintiffs testified to and said the defendants could not perform. Then there was the June 19 conversation. In the June 19 conversation, Plaintiff Brian Kelly testified, defended Dr. Yockey and said, We have another buyer on the contract for the house for the same price. What would you guys like to do? There was a discussion about whether there would be a responsibility for a commission, et cetera. In either event, whether it's May 2 or June 19, 2008, I believe it's more May 2, this anticipatory repudiation occurred long before the pleaded or pled breach of contract on August 20, 2008. Our position here is, we cite the case law, that the pleadings do not conform to the judgment. When you agree, and I think everybody will agree that everybody agreed to extend to June 20 to August 20, how can you anticipatorily repudiate before that date? Well, that's exactly my point, and that's kind of going down the line there when we talk about the second sub-issue or second issue. It strains credulity, as we have described in our brief, to say that a party has anticipatorily breached and the plaintiffs consider them to have anticipatorily repudiated when, at the same time, they're agreeing to extend the contract to August 20. It cannot be reconciled. It is irreconcilable. So it's kind of part and parcel of two points there, Your Honor. Number one, the pleading, the complaint is pleaded, is irreconcilable with the judgment entered, and the judgment entered based upon anticipatory repudiation is irreconcilable with the evidence of record, which would, of course, be our second point. But as to this point, we've cited the case law, the judgment or decree will not stand in front of the proofs without allegations or under allegations without supporting facts. And there never was a motion to conform. There never was anything that would look like that. Never was anything, Your Honor. There was ample opportunity to file a motion to amend the pleadings, to conform to the proofs, to whatever, under 216. That wasn't done. Wasn't there some mention maybe in, was it written closing argument? Yes. Closing argument? Yes. There's no question but that the word anticipatory repudiation or breach appears in plaintiff's written closing argument. We submit, however, that this mere assertion is not sufficient to take the place of a pleadings requirement. You've got a pleading that still says breach of contract, and it alleges a breach as of August 20 to insert in the closing argument that, oh, well, there's an anticipatory repudiation earlier in that, and then say that everybody was on notice and unaware of that. We don't believe meets formal pleading requirements in Illinois. Although you were not trial attorney, as I recall. No. Was, did your clients defend against breach of contract or anticipatory repudiation? I believe they defended based upon breach of contract. They may have, and I'm not recalling directly, Honor, they may have responded in some aspect in the written closing arguments to any suggestion of anticipatory repudiation. I'm not certain of that, and I'm not recalling it as I'm standing up here, and I apologize for that. But that wouldn't be evidence. That's not evidence. That would be a persuasion argument. No. It was obviously cross-examination going on. One party says, this is my conversation on May 2, 2009, and cross-examination of the party, and the defendants put on their testimony what they recall about the conversation of May 2, 2009, or of the telephone call from the golf outing on June 19, 2008. But, again, there's still not those allegations in there. This case was tried based upon the theory pleaded. As to our next and somewhat related point about no clear and equivocal repudiation for anticipatory breach, we've tried it out in the case law, and the case law is very clear. What is clear is that the anticipatory repudiation must likewise be very clear and unequivocal. It can't just be some statement of, well, maybe we can't, maybe we won't, maybe we don't have the ability. And, again, this goes back to the point of how can there be an anticipatory repudiation, a clear and unequivocal statement that we are not going to perform under this contract, when the one thing everybody agrees to that came out of the May 2 conversation is, well, two things, actually. The parties agreed to extend the closing date to August 20, and that the parties agreed that the plaintiffs could list their property. If we agree with you that the trial court ruled on a basis that wasn't pledged, do we still have the opportunity to review the record and determine whether or not there was sufficient evidence to support the cause of action as pledged? And that's an excellent question. At first blush, it would seem to me, it would appear to me that if you rule that the pleading is insufficient, it's game over. But then what happens when we're put on the court's directions upon remand, and perhaps the court's directions on remand may want to discuss the sufficiency of the evidence. Because if you're saying the pleading is insufficient, is that the be-all and end-all is over. It seems that way to me, but if there is any sort of further direction upon remand, then I guess it's okay to go into that aspect of it. But again, our position is if the pleading is insufficient, then it's reversed and there's nothing else to do. How did the judge come up with the damages of $150,000? He came up with the damages component by taking a subsequent contract, okay? Well, by taking this contract for $1.2 million and a subsequent contract after a subsequent contract that came out at $1 million. And that original contract was signed at $1.1 million. It was reduced to $1 million at time of closing because of a valuation aspect that there couldn't be financing unless the parties agreed to knock down the price. So it took the difference there between the $1.2 million and the $1 million down the road, which is $200,000, subtracted the $50,000 liquidated damages that the plaintiffs obtained from the immediately subsequent contract. Right. So it took the $200,000 difference, reduced it by the $50,000. Now, our position as to damages, and that's the back end of our brief, but as to damages is we have a situation here where, okay, the chronology is June 19, 2008. After the conversation in May 2, 2008, the conversation occurs and says, hey, we have another contract offer here. Same price. Will you pay the Brokers' Commission? Well, no, we don't really feel responsible for the Brokers' Commission. But, you know, if you have a buyer, then get going. So the plaintiffs enter the contract with the De Silvestros, $1.2 million, June 19, 2008. So your point is that the damage should have been $30,000? Well, my point here is the damage. $30? $29.95? I'm going for zero, Your Honor. And you'll get your car painted green. $39.99. There's two responses, Your Honor. Number one, under the case law, you have the $1.2 million, the subsequent contract for the $1.2 million. That's the best evidence of market value. So in essence, there are no damages. But number two, as to the commission, I know our brief mentioned the $30,000, but there still was no proof in the record here of what that actual commission was. That was a speculative amount, let's say, that was discussed back and forth based upon that $1.2 million contract. So there still was no evidence of what that Brokers' Commission was in the record or what that Brokers' Commission would have been in the record. So my position is zero is the amount of damages because it's $1.2 million and $1.2 million. The amount of damages cannot be the $1 million contract after the $1.2 million contract. Those, and that aspect of things, too, we tried out some more of the case law about. Damages for breach of contract or otherwise have to be those that are approximately caused. And those damages down the road were not approximately caused by these defendants. That's a separate default, which then brings me back into point number three, and point number three being the fact that there was an election of remedies here. Before you get to point number three, counsel's brief, opposing counsel's brief, says that your client's contract, well, the logical extension of his argument was that your client's contract existed forever or until there was a closing. So we could have gone through five, six, seven, eight, nine, ten different contracts in this case that didn't work. How can it last that long? I mean, especially after there was a deal. De Silvestri said we're buying it, and for no fault of your clients, that contract failed. Correct. We can't keep going ad infinitum, and this does a little nudge into my third point. But the fact of the matter is there's got to be a stopping point. Now, take a look at this residential real estate contract. That's a standard form contract, and you've got the paragraph in there, paragraph 31C, and I believe that's at pages C14 and 15 of the record. It deals with a situation where the seller, while under contract, gets another offer, but nothing under that provision or anything was checked. So there would have been, you know, something to do, something not to do, something the buyer could do or not do to trigger it, to void it, whatever, if this section of the contract had been filled out or checked, but it was not. But to respond to Your Honor, we don't believe that this could go ad infinitum forever. There's got to be a stopping point here, and the stopping point here, quite frankly, is as of June 19, 2008, when the Kellys, the plaintiffs, elected to enter into a new contract with the De Silvestros, the third party, the first third party, and the De Silvestro contract was at $1.2 million. So they elected their right to enter into a contract with the De Silvestros, and when that contract failed, there was a liquidated damages provision with the De Silvestros. It said upon any default by the buyer, the seller, which is plaintiffs in this case, the Kellys, are entitled to retain the $50,000 earnest money deposit. That was the liquidated damages component of that contract. So election of remedies. Are you saying that the defendant's contract with the plaintiff terminated when the plaintiff entered into a new contract with the third party or when that third party defaulted? Or neither? But I thought that's what you said. Whether the plaintiff's contract with the defendant's terminated upon, that's a bad way to answer a question is to repeat it. I'm going to say, as I'm standing here, I think things stopped upon the entry of the new contract with the De Silvestros. Upon the new contract being executed? Yes. You're saying that terminated the old contract? I'm not sure if I want to use the word terminated. I prefer the word released, the defendant's. How about when August 20th went by? Oh, that's definitely over. I mean, that would be, that's a pretty clear point. Yes. And in terms of August 20th, what I do want to mention also for the panel, and it is in the briefs, but if they were to try and schedule a closing, they being my clients and the defendant, try to schedule a closing on August 20th, how could they close? There are two aspects to this written standard form residential real estate contract that couldn't be complied with. You've got to provide a warranty of written merchantable title, and you've got to, well, I'm drawing a blank on the second one. But because of the pending contract with the De Silvestros, the plaintiffs could not provide these aspects under contract on August 20th, 2008. Well, the house could have been kind of crowded if everybody got to live there. And the suggestion was also made in the plaintiff's brief, I'm sorry, that they should go forth with the contract on August 20th, and then if the plaintiffs aren't there for closing, then sue them. Well, that's just adding litigation onto litigation, and we don't feel that's a valid suggestion. That is enforceable, though, right? Wouldn't they have had, if they had sued for specific performance, they would have had an actionable? Well, I'm going to say, Your Honor, that I don't think there would be a possibility of performance because of the other pending contract. And I guess this gets into a little more, I don't know, words of thought. What title company is going to say I'm going to issue this and this and this and do a warranty of title where there's another contract pending? You couldn't perform. Wouldn't that be sufficient evidence, as you suggested, about it should be clear and obvious that the litigation that was filed would be repudiation of the other contract? The De Silvestri one? Yes. Oh. Yes. Because De Silvestri's contract, I believe, is the one that you're suggesting would create a cloud on title which would preclude a valid warranty deed. Absolutely. That existing contract would have clouded it. So by filing the litigation seeking specific performance against your client, wouldn't that be a repudiation of the other contract, which would then put them in a rather interesting position, which is either they have to pay damages or they would have to. Of course, I don't know that the trial court would grant the De Silvestri a specific performance. Right. Since the property has already been transferred to a person who had contracted with the plaintiffs previous to the situation. But be that as it may. Certainly, that's another layer here. Any other questions? No, thank you. Thanks.  Thank you, Your Honor. Mr. Christensen? Yes. You may proceed. Thank you. And maybe, Mr. Christensen, I want to follow up on a question before you get going because I don't want you to be thrown off by it. I asked Mr. Black how many people can live in that house at the same time. How many people can own that house at the same time? Only one. Okay. And ultimately, there were only two owners. There were the Kellys and there was Mr. Gerber. The defendants never became owners because they never tried to be. They never made any effort whatsoever to enforce this contract. But if they did enforce the contract on August 20th, where were the De Silvestris going to go? Because they weren't scheduled to close until October 19th. That is a question that we'll never have the answer to because the defendants did nothing. They treated this contract as canceled in their mind. When? They testified that when they were told that a contract had been entered into with the De Silvestris, that they had the impression. The testimony was very vague. It meant to me that we did not have to proceed. They didn't do anything after that. But, you know, there's a difference between an anticipatory breach excusing, canceling the contract for purposes of performance, period, which is what the case law says. When you breach anticipatorily, you excuse the other party from performance. It doesn't mean that you're released from the contract or anybody is released from the contract. Further performance is excused. And our position is that when the conversation happened, and by the way, there's a very, very important factual point, and we're now completely off of my outline, but hopefully we'll get back to it. There's a very important factual point. The discussion in which the defendants said we can't close, we are unable to consummate the purchase of your home, there is zero evidence in the record that that happened on May 2nd, 2008, the date that the extension was agreed to. In fact, there was a stipulation in the record that there was a May 2nd extension and there was a discussion in May. That's all we could come to in terms of a stipulation was that there was a discussion in May where they said we're not going to be able to do this deal. So the suggestion that it didn't make any sense that there could be a repudiation at the same time that you're extending the closing date, that's premised on a fact that wasn't in the record. But they continue, there is testimony, they continue to talk to a lone person to try to do a bridge for their house because there's no contingency. There is evidence that Nicole Kelly tried to sell their house until June 19th or shortly thereafter. Right, and a repudiation can be retracted until the opposing party changes their position. So how many repudiations are you alleging here? One. When? In early May 2008, after May 2nd, 2008. But when all parties testified that there was a statement on that date, we are not able to close. Then why did the letters start coming on August 21st? There was an earlier letter on July 25th, and it's also true. I mean, the law provides a number of remedies when there is an anticipatory repudiation, one of which is to wait until the date of performance and then declare the other party in breach. That's one possibility. So you could really say there was this anticipatory repudiation back in May 2008. A number of things could have happened between that date and the closing date. Once we get to the closing date, what is there left to argue about? Did they, during this conversation, was it as blunt and as truncated as you suggest? Certainly that was the answer. Or was there some factual basis or rationale given for why they didn't think they were going to be able to close? They stated that we are not able to sell our house. We are not able to close. I mean, certainly the testimony was that that was the reason that they were stating their inability to close. And it was at that time that the decision was made, well, we're going to put our house on the market. And once again, any time before our house, before the Kelly's home sells, there's the possibility to retract the repudiation. It's very well settled in the case law that until the other party suffers a change in position, the repudiation can be retracted. But they never did that. They never did anything. August 20th came and went. And at that point, there's really not much left to talk about. Whether it was anticipatory repudiation back in May or a breach of the contract in August, you know, there's all kinds of things that they could have done whereby we would have a totally different case here. They could have agreed. When the Kelly's suggested, you know what, we've got $30,000 damages here, they could have agreed. You know what? Sounds fair to us. Let's have an accord and satisfaction. $30,000. We're done. What did they do? They said no. They rejected it. And by doing nothing, they told us we're not going to be able to close. So when Brian Kelly called and said we've got this contract and we think you owe us $30,000, he also said this will release you from our contract? I'm not saying that it was that explicit. How was it? How would they have known that from the conversation I saw on the record? Well, I mean, what I understood the testimony to be was, you know, we're going to have this commission and you're going to be responsible for that. And the answer was, no, we don't think that we should be. And the point I'm making is. You're going to be responsible for that and then what happens? You still close on our house? Well, because they rejected it, we don't really know. The point I'm making is. Well, he has to give them an option. And what option did they have? Pay it and we're still going to close with the diesel back streets? They could have certainly said, well, Brian, if we're going to pay that $30,000, we want to be clear that we have no further liability to you. What if they didn't say that? What if they said we'll pay you $30,000 and they didn't say that they were off the books? So that meant that they'll pay the $30,000 plus, you know, the parking costs and an oil change? No. Your argument, I guess the phrase is lax predulity, even though that's the term Mr. Black used when I thought it should have probably been lax logic. Your argument lacks logic and predulity because the concept that they're supposed to now literally enter into an oral amendment to a written contract or there is, according to you, there's only one way to clarify and resolve these matters. If that were the case, then what's the point of having written contracts if oral contracts can be that binding? Well, I mean, the burden is on the. If the defendants are claiming that there was a release and a court of satisfaction or something along those lines, it's their burden to establish that. There were some vague discussions. I can agree that they were vague discussions. It was unclear to anybody what we were really doing. These are lay people who have been friends for years talking about the situation, and there's some discussion about, you know, you'll be responsible for our commission, but that doesn't get finalized into anything. Remotely approaching a release of the contract, a release of their liability, or a court of satisfaction, and that was their burden to prove. You were asked what was or what is your position relative to when the repudiation took place, and you gave it. You said May 2nd. Did you not? No, I said it was in May. I did not say May 2nd. It was in early May? Yes, Your Honor. Okay. What did the trial court say? The trial court said the same thing. The trial court did not say that there was a repudiation on May 2nd. The trial court said that in May of 2010, there was a repudiation. That was the court's, that was the wording of the court's record. So the trial court picked May rather than June for the repudiation. Correct. Correct. I was going to say, do you want to get to your outline now? So, yes, and thank you. Let's talk first of all about the issue of the pleadings and the proofs. And I was trial counsel. The discussions in May of 2008 were the subject of extensive testimony at trial without objection. There was a motion for a directed verdict raised, at which point I responded with discussions of repudiating the contract. There was no objection. I filed a written closing argument where I clearly argued anticipatory repudiation. The defense not only did not object to this, they acknowledged it, discussed it, and opposed it. They wrote in their closing argument, plaintiffs now argue that a breach occurred prior to June 19th, 2008. That's a quotation from their closing argument. So they directly addressed and responded to this argument without ever, at the trial court stage, raising the issue of conforming the pleadings to the proofs. Well, why would they do that? Why would they strategically tell you that maybe you made a mistake? Because they should be thinking that if we get to the appellate court and we're going to make an argument and we had the opportunity to raise it in the trial court and it could have been cured had we raised it quite readily, then we're going to be deemed to have waived that argument. So we'd better. But they defended this action as a breach of contract, period. They did not defend it. That's argument. That was not evidence. They defended it pursuant to Mr. Black's interpretation as strictly a breach of contract, not an anticipatory repudiation. So you're saying that the argument now takes the place of the evidence? Well, that's Mr. Black's interpretation. But as I say, the evidence at the trial court was very extensive as to those conversations. And there was much back and forth and differing versions of those conversations. Did you ever use anticipatory repudiation face-to-face with the trial court until motions to reconsider or whatever happened later? I mean, it wasn't raised in question. Did you ever say the word? I don't recall, Your Honor, whether I ever said that word. Did anybody else ever say the word? Again, I don't recall specifically any particular words being used. Okay. But just one more point on that issue. It has to do with the case law. All of the cases that the defendants cite on this issue are either distinguishable or in favor of the plaintiffs. Most particularly a case that cited in reply, Stowell v. Sartorius. That case held that where there was an allegation of a constructive trust and proof of a written trust, the court wasn't going to find that as a basis to reverse because there's not conformity between the pleadings and the proofs. And what the court said was, if you haven't been misled to your prejudice, then you can't complain about the pleadings not conforming to the proofs. There's been no indication that they were misled or prejudiced by this. All of these facts were fully flushed out, fully addressed in the trial court. But they defended breach of contract, not anticipatory repudiation. There is a significant difference in those two actions. Well, I think that the only thing that they could show that they would have done differently in the defense is somehow raise some additional evidence about what happened in May of 2008. And they didn't do that. They haven't told us what they would have done differently. Because we're not taking new evidence either. Well, I think there should be some burden on them to explain, you know, here's how we were misled. Here's how we were prejudiced. That's under the sartorius case. And they haven't done that. Have you ever heard of the term demurrer? D-E-M-U-R-R-E-R. I believe that's the spelling. I have. Could you tell me what it is? I can't. I believe what it is is a common law. Someone would file a demurrer. And it would basically say, you have a pledge clause of action. And under the old common law rules, if you didn't plead a clause of action and the demurrer was granted and the case was dismissed with prejudice, you were not allowed to plead over it. It was rather, how should I put it, lenity wasn't granted when it came to proper pleadings. And so there was a time when if there was a pleading and it didn't say the clause of action, you were gone if somebody wanted to file a demurrer. In this case, you have a situation where you file a pleading, and on review we're supposed to determine whether or not there is evidence to sustain the pleading. And you're arguing that they didn't file a demurrer, they didn't claim they were prejudiced, which would seem to me that if they didn't complain, they wouldn't also complain about being prejudiced. Because if they said that they were prejudiced, then that would probably put you on notice that there was some defect in the pleadings as between the pleadings and the proof. So I'll buy your argument that maybe they have forfeited the argument, but I won't buy the argument that arguing lack of prejudice or claiming prejudice would be the same thing or tantamount to exonerating you for failing to raise the issue. As an eloquent and competent insurance defense lawyer, Scott Durant, who is no longer with us, once gave me some sage advice. He said, I never file a motion to dismiss. Why should I educate my opponents? And that's a good question. Why should people educate their opponents? And that's what you're asking Mr. Black to do, or at least trial counsel for the defendants, which is to educate you what you are supposed to do relative to filing pleadings that conform to the proofs. I have no other questions. Do you? No, I do not. Not now. Thank you. Thank you. Thank you. Good morning again, Your Honors. Briefly in rebuttal, opposing counsel talks about how a critical fact here is the timing of the discussion. I'm going to submit that had anticipatory repudiation been pleaded, then the record would have been sufficiently fleshed out as to the timing of any different respective conversations. What the record says is that the parties got together on May 2nd. There's a difference in terms of was this for a party for the kids' birthdays or whatever, and the discussion took place. But again, had anticipatory repudiation been pleaded, we'd have a better record in that regard. Mr. Christen didn't say something, but it's clear that in your client's mind, they, I'm not sure exactly how he said it, but the gist of it was it was clear in their mind that they weren't going to follow through with the contract. And I'm sorry I didn't say it to him at the time. Well, the fact that it was clear in their mind doesn't mean it was clear to other parties who don't have the ability to read their minds. And so it's not what's in their mind. It's what they presented or conveyed through words, actions, semaphore signals, smoke signal, whatever. And so I would like you, if you would, to comment on what were those things that they communicated, regardless of whether in their own mind they thought it was going to be an impossibility, to the plaintiffs that would indicate that they were going to repudiate or had repudiated or had the intent to repudiate the contract. And if you can't think of anything, I'm not going to force you to think of something. I really can't come up with anything only from the aspect that my defendants responded to what they saw. What they saw were the plaintiff's activities. Didn't or is this testimony agreed to that Nicole Kelly, as a realtor, said, you know, if we put our house on the market and ours is more expensive than yours, that'll get people out on the street and they'll come down and look at your house, which may then get your house sold so you can buy our house. Absolutely. There was testimony that all the parties talked about, except for Plaintiff Brian Kelly, that Nicole stated and Larry Arrico thought it was a good idea, Dr. Yockey thought it was a good idea, that, okay, you sell your house listed at 1.2, ours is listed at 1, it's going to bring more traffic into the neighborhood, people are going to see two real nice houses, they're going to see one that's $200,000 less, and it's going to attract more traffic to our house. Absolutely. But that is agreed to? Yes. One of the plaintiffs remembers that conversation? Correct. Mrs. Kelly testified to that effect. So that would indicate that if their house is still for sale and they still have it listed for sale, that they have some interest in still buying that house as of May 2nd? They being your clients. They want people on the street to look at the house. They felt it was a good idea, that's correct, to have this ongoing. Yes, correct. Unless there's anything else, we would ask for this court to reverse the judgment of the circuit court. Thank you for your time.